Todd C. Theodora, Esq. (State Bar No. 120426)
ttheodora@tocounsel.com
Timothy J. Heggem, Esq. (State Bar No. 276060)
theggem@tocounsel.com
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

Attorneys for Plaintiffs
KAIROS INVESTMENT
MANAGEMENT COMPANY, LLC and
KAIROS MANFORD PRIVATE
EQUITY FUND I LP, a British Virgin
Islands limited partnership

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| KAIROS INVESTMENT MANAGEMENT COMPANY, LLC and KAIROS MANFORD PRIVATE EQUITY FUND I LP, a British Virgin Islands Limited Partnership, | Case No. |
|---|---|
| Plaintiffs, | **COMPLAINT FOR DAMAGES** |
| vs. | **1. Securities Fraud in Violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5** |
| J.P. MORGAN SECURITIES LLC, JPMORGAN CHASE & CO., and DOES 1 through 10, inclusive, | **2. Securities Fraud in Violation of Cal. Corp. Code §§ 25401 & 25501** |
| Defendants. | **3. Fraud and Deceit in Violation of Cal. Civ. Code §§ 1709 & 1710** |
| | **4. Constructive Fraud in Violation of Cal. Civ. Code § 1573** |
| | **5. Negligent Misrepresentation** |
| | **6. Violation of UCL, Bus. & Prof. Code § 17200** *et seq.* |
| | **DEMAND FOR JURY TRIAL** |
| | Trial Date:         None Set |

THEODORA ⫫ ORINGHER
COUNSELORS AT LAW

1280117.1/81925.01001

Plaintiffs KAIROS INVESTMENT MANAGEMENT COMPANY, LLC ("KIMC") and KAIROS MANFORD PRIVATE EQUITY FUND I LP, a British Virgin Islands Limited Partnership (the "Kairos Fund") (collectively "Plaintiffs"), make the following allegations and prayers for relief against Defendants J.P. Morgan Securities LLC ("JPMS"), JPMorgan Chase & Co. ("JPMC"), and DOES 1-10 (collectively, "Defendants"). Plaintiffs allege on information and belief as follows:

## INTRODUCTION

1.      Plaintiffs bring this action against J.P. Morgan for its material misrepresentations and omissions that induced the Kairos Fund to invest in a Series F investment round for China-based grocery retailer, Missfresh Ltd. ("Missfresh") immediately prior to its initial public offering ("IPO").

## THE PARTIES

2.      Kairos Investment Management Company LLC is a Delaware limited liability company that serves as the Investment Advisor for the Kairos Fund. KIMC has its principal place of business in Irvine, California.

3.      Kairos Manford Private Equity Fund I LP is a British Virgin Islands Limited Partnership.

4.      J.P. Morgan Securities LLC is a Delaware limited liability company with its principal place of business in New York, New York. It has been a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act since December 13, 1985, and an investment adviser registered with the Commission pursuant to Section 203 of the Advisers Act since April 3, 1965. It is a wholly-owned subsidiary of JPMC.

5.      JPMorgan Chase & Co. is a global financial services firm incorporated in Delaware and headquartered in New York, New York.

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, because the claims alleged herein

arise under and pursuant to Section 10 of the Securities Act of 1934, 15 U.S.C. § 78j(b).

7.     This Court supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), over Plaintiffs' state law claims because, as here, a federal district court may exercise supplemental jurisdiction over state-law claims that the Court would not otherwise have subject matter jurisdiction to hear, as long as the claims are part of the same case or controversy as the claims over which the court has original jurisdiction.

8.     This Court has personal jurisdiction over Defendant, and venue is proper in the Central District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## GENERAL ALLEGATIONS

9.     Upon information and belief, JPMS is an investment banking house that specializes in, among other things, underwriting public offerings of securities. Defendants' participation in and their solicitation of purchases of Missfresh shares were motivated by their financial interests.  The group of underwriters for Missfresh, which includes JPMS, received over $19 million in fees and commissions in connection with their sale of Missfresh American Depository Shares ("ADS") following the initial public offering, or approximately $22 million in fees and commissions upon the full exercise of the underwriters' option to purchase and offer additional ADSs through their overallotment.

10.     Upon information and belief, JPMS also demanded and obtained an agreement from Missfresh that Missfresh would indemnify and hold it harmless against certain liabilities, including liabilities under the Securities Act.

11.     Upon information and belief, JPMS was deeply involved in Missfresh's equity raising activities and willing to merchandise Missfresh pre-IPO shares and post-IPO ADS in return for its share of the proceeds following the IPO.

12.     In that vein, JPMS also worked with Missfresh, pre-IPO, to raise equity. The final raise before the IPO was a Series F offering.

*COMPLAINT FOR DAMAGES*

THEODORA ORINGHER
COUNSELORS AT LAW

13.     On or around late-April 2021 and early-May 2021, Defendants learned of a potential opportunity to invest in the Series F, pre-IPO offering by Missfresh.

14.     From May 6, 2021 to May 26, 2021, Missfresh began sharing documents with the Kairos Fund.  The Kairos Fund received an investor presentation, a sum-of-the-parts ("SOTP") valuation, and a Missfresh/Dingdong economic comparison document from Missfresh, each of which contained metadata confirming they were prepared by JPMS.

15.     Upon information and belief, JPMS was highly involved in Missfresh's Series F equity raise.  For example, on May 19, 2021, Missfresh's Chen Xi ("Catherine Chen") emailed David Hu of the Kairos Fund about investing in Missfresh.  On May 22, 2021, another Missfresh employee sent Hu a link to an upcoming Zoom video call.   Two days later this employee informed Hu the Zoom call would be opened by "JPM colleagues" and "[f]or the convenience of JPM operation, we will use their Zoom conference call line . . . ."   The next day, on May 25, 2021, the Missfresh employee sent Hu two password-protected attachments created by JPMS described as a "valuation analysis" and "comparative analysis."

16.     The "comparative analysis" shared by Missfresh is a two-page PDF entitled "Missfresh vs. Dingdong Comparison," dated May 2021.  At the time, Dingdong was Missfresh's main competitor.  It describes Missfresh as better than Dingdong by several metrics, including number of SKUs, user experience, loss rate, and various unit economics.

17.     The "valuation analysis" shared by Missfresh is an Excel spreadsheet showing a Sum-of-the-Parts ("SOTP") Valuation dated May 14, 2021.   The spreadsheet gives valuations for each of Missfresh's business lines: On-demand Distributed Mini Warehouse ("DMW") Retail, Intelligent Fresh Market, and Retail Cloud.   It then sums those parts and gives Missfresh a "[f]ully diluted equity valuation" of $10.996 billion dollars.

/ / /

18.    Missfresh and JPMS also jointly held an investor presentation on May 26, 2021 via Zoom videoconferencing ("Investor Call").  Missfresh executives including Catherine Chen presented during the Investor Call along with a number of JPMS representatives, which notably included a JPMS vice president on the TMT team in Hong Kong.  Following the Missfresh executives presentation, JPMS provided a presentation regarding its valuation of Missfresh.  During this presentation, the JPMS VP displayed a version of the SOTP valuation with an even higher value than the one sent to the Kairos Fund on May 25, 2021.  The JPMS VP concludes her SOTP analysis by giving Missfresh a valuation of "around $12 billion US dollars."

19.    JPMS purportedly conducted an adequate and reasonable investigation into the business and operations of Missfresh, an undertaking known as a "due diligence" investigation.  JPMS was required to undertake the due diligence investigation in order to engage in the IPO, which was presumably underway or near finished by the time the Series F equity raise occurred, which was shortly before the IPO.  During the course of their "due diligence," JPMS had continual access to confidential corporate information concerning Missfresh's operations and financial prospects.

20.    As the Kairos Fund received this information, it was sharing it with potential investors, in order to begin raising funds.

21.    Limited partners began joining the Kairos Fund and investing funds to Missfresh.  By June 24, 2021, the Kairos Fund had purchased over $53 million ($53,072,068.56 USD) in Series F shares which would auto convert to Missfresh common shares upon the IPO ("Securities") in reliance of JPMS's representations regarding the $12 billion valuation and health of Missfresh as a company.  The Kairos Fund would never have invested in Missfresh but for JPMS's valuation.  It relied on JPMS's expertise and, more importantly, its knowledge of Missfresh in particular.

22.    On June 25, 2021, Missfresh went public at $3 billion.  Within a couple weeks it was trading at less than $2 billion—far below the $12 billion valuation touted

COMPLAINT FOR DAMAGES

by JPMS.

23.    In the days leading up to the Missfresh IPO, JPMS representatives repeatedly assured the Kairos Fund there was strong support for the IPO in the price range Defendants previously represented, even when it must have been clear that was not true.

24.    Much has come to light since Missfresh made its IPO on June 25, 2021. In July 2022, after an independent internal audit, Missfresh admitted its 2021 financial statements contained material inaccuracies and omissions. Consequently, Missfresh restated—and reduced by a material amount—its previously reported net revenues. To this day, Missfresh still cannot accurately estimate its total losses, and it has not timely filed its 2022 annual report.

25.    Upon information and belief, the audit uncovered systemic failures in Missfresh's business fundamentals and internal financial controls. Missfresh now admits it based its financials on gross fabrications, including undisclosed relationships between suppliers and customers, different customers and suppliers sharing the same contact information, and a lack of supporting logistics information. The strong indication is that Missfresh was not a viable business. The evidence also shows extreme misconduct and fraud on the part of executives at Missfresh, many of whom have now resigned in disgrace.

26.    Upon information and belief, JPMS knew about these failures in Missfresh's fundamentals and financials. It was intimately involved with Missfresh's leadership, including its former CFO Catherine Chen, well before the IPO. It had continual access to Missfresh's confidential corporate information. And it used that information to create highly favorable presentations about Missfresh's operations, financial condition, and prospects, including the $12 billion valuation it touted to the Kairos Fund during the Investor Call.

27.    JPMS had unbridled access to internal corporate documents and access to Missfresh's lawyers, management, directors, and top executives to determine: (i)

the strategy to best accomplish the IPO; (ii) the amount of funds needed pre-IPO; (iii) the terms of the IPO, including the price at which the Missfresh ADS would be sold; (iv) the language to be used in official documents; (v) what disclosures about Missfresh would be made; and (vi) what responses would be made to the SEC in connection with its review of the submitted documents. As a result of these constant contacts and communications between the JPMS and Missfresh's lawyers, management, directors, and top executives (as further evidenced by the Investor Call), at a minimum, JPMS was negligent in not knowing of the materially untrue statements and omissions contained in the documents it prepared and Missfresh presented to the Kairos Fund as detailed herein.

28.    Upon information and belief, in addition to misvaluing Missfresh, JPMS also accelerated the Missfresh IPO. JPMS knew Missfresh was in dire straits, but it rushed the IPO to collect millions in fees and commissions before this knowledge became public. Moreover, it used the Kairos Fund's pre-IPO investment as social proof to make the Missfresh IPO seem more appealing to other investors.

## FIRST CAUSE OF ACTION

**(Securities Fraud in Violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 Device, Scheme, or Artifice to Defraud and Untrue Statements of Material Fact In Connection With Purchase or Sale of Securities)**

**Against All Defendants**

29.    Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 28 above and incorporates them by reference as though fully set forth herein.

30.    Defendants directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made, not misleading.

31.     Defendants' material misrepresentations and omissions of material facts included: grossly overstating the value of Missfresh; presenting company financials as the basis for that valuation which the company has now publicly stated were false due to overstated revenue; presenting Missfresh as comparable to a successful company, Dingdong; stating that there was strong support for the IPO in the price range that had been represented, even just days prior to the IPO when it must have been clear that was not true; and repeatedly endorsing a business it knew would not perform well upon IPO.

32.     Plaintiffs were unaware of and reasonably and justifiably relied upon Defendants' material misrepresentations and omissions when they invested in Missfresh, as well as foregoing other potential investment opportunities.

33.     As a direct and proximate result of each of Defendants' material misrepresentations and omissions, and artifices to defraud, Plaintiffs have been damaged in the sum of at least Fifty-Three Million Seventy-Two Thousand Sixty-Eight Dollars and Fifty-Six Cents ($53,072,068.56 USD).

34.     By virtue of the foregoing, Defendants directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to Plaintiffs for all damages and harm caused by same.

## SECOND CAUSE OF ACTION

### (Securities Fraud in Violation of California Corporations Code §§ 25401 & 25501)

### Against all Defendants

35.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 34 above and incorporates them by reference as though fully set forth herein.

36.     California Corporations Code Section 25401 states that "[i]t is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication which includes an untrue statement of a material fact or omits to

state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

37.    Defendants, and each of them, violated California Corporations Code Section 25401 by selling securities to Plaintiffs by means of written and oral communications that included untrue statements of material fact and omitted to state material facts necessary to make the statements made, considering the circumstances under which the circumstances were made, not misleading.  These misrepresented and omitted material facts include but are not limited to: grossly overstating the value of Missfresh; presenting company financials as the basis for that valuation which the company has now publicly stated were false due to overstated revenue; presenting Missfresh as comparable to a successful company, Dingdong; stating that there was strong support for the IPO in the price range that had been represented, even just days prior to the IPO when it must have been clear that was not true; and repeatedly endorsing a business it knew would not perform well upon IPO.

38.    The representations made by Defendants, and each of them, were false when they were made.

39.    Defendants knew or had reasonable grounds to believe that these statements and omissions were false and misleading.

40.    As a direct and proximate result of the violation of Corporations Code Section 25401, Plaintiffs have been damaged in the sum of at least Fifty-Three Million Seventy-Two Thousand Sixty-Eight Dollars and Fifty-Six Cents ($53,072,068.56 USD).

41.    The aforementioned acts of Defendants, and each of them, were oppressive, fraudulent, and malicious within the meaning of California Civil Code Section 3294.  Defendants' actions were committed with the intent to annoy, harass, and vex Plaintiff; and they were committed with a willful, wanton and conscious disregard of the rights of Plaintiffs.  Defendants authorized and ratified the JPMS VP's wrongful conduct as alleged herein, and the advance knowledge and conscious

1   disregard, authorization and ratification were on the part of an officer, director or

2   managing agent of Defendants.  Plaintiffs are therefore entitled to an award of

3   exemplary damages against all Defendants according to proof.

4                              **THIRD CAUSE OF ACTION**

5   **(Fraud and Deceit in Violation of California Civil Code §§ 1709 & 1710**
    **and Common Law)**
6                            **Against All Defendants**

7

8        42.    Plaintiffs repeat and re-allege each and every allegation contained in

9   Paragraphs 1 through 41 above and incorporates them by reference as though fully set

10  forth herein.

11       43.    California Civil Code Section 1709 states that "[o]ne who willfully

12  deceives another with intent to induce him to alter his position to his injury or risk, is

13  liable for any damage which he thereby suffers."

14       44.    California Civil Code Section 1710 defines "deceit" as "[t]he suggestion

15  as a fact, of that which is not true, by one who does not believe it to be true," "[t]he

16  assertion, as a fact, of that which is not true, by one who has no reasonable ground for

17  believing it to be true," "[t]he suppression of a fact, by one who is bound to disclose

18  it, or who gives information of other facts which are likely to mislead for want of

19  communication of that fact," or "[a] promise, made without any intention of

20  performing it."

21       45.    Defendants, and each of them, for the purpose of inducing Plaintiff's

22  purchase of securities, made false and misleading statements of material facts and

23  omitted to state material facts necessary to make the statements made not misleading

24  considering the circumstances under which they were made.

25       46.    Defendants' material misrepresentations and omissions of material facts

26  included: grossly overstating the value of Missfresh; presenting company financials

27  as the basis for that valuation which the company has now publicly stated were false

28  due to overstated revenue; presenting Missfresh as comparable to a successful

company, Dingdong; stating that there was strong support for the IPO in the price range that had been represented, even just days prior to the IPO when it must have been clear that was not true; and repeatedly endorsing a business it knew would not perform well upon IPO.

47. The representations made by Defendants, and each of them, were either wholly false when they were made, or they consisted of misleading half-truths fraught with omissions that made the statements fraudulent and misleading.

48. Defendants knew their representations were untrue or made such representations with reckless indifference to the truth or in a manner not warranted by information known to Defendants.

49. Defendants purposefully made these misrepresentations to induce reliance by Plaintiffs and to convince Plaintiffs to purchase the Securities and invest in Missfresh.

50. Plaintiffs were unaware of and reasonably and justifiably relied upon Defendants' material misrepresentations and omissions in purchasing the Securities and remaining invested in Missfresh, as well as foregoing other potential investment opportunities.

51. As a direct and proximate result of the violation of Civil Code Section 1709, Plaintiffs have been damaged in the sum of at least Fifty-Three Million Seventy-Two Thousand Sixty-Eight Dollars and Fifty-Six Cents ($53,072,068.56 USD).

52. The aforementioned acts of Defendants, and each of them, were oppressive, fraudulent, and malicious within the meaning of California Civil Code Section 3294. Defendants' actions were committed with the intent to annoy, harass, and vex Plaintiffs; and they were committed with a willful, wanton and conscious disregard of the rights of Plaintiffs. Defendants authorized and ratified the JPMS VP's wrongful conduct as alleged herein, and the advance knowledge and conscious disregard, authorization and ratification were on the part of an officer, director or

managing agent of Defendants. Plaintiffs are therefore entitled to an award of exemplary damages against all Defendants according to proof.

## FOURTH CAUSE OF ACTION

**(Constructive Fraud in Violation of California Civil Code § 1573 and Common Law)**

**Against All Defendants**

53. Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 52 above and incorporates them by reference as though fully set forth herein.

54. Defendants made statements to Plaintiffs that were materially false and failed to disclose information that made other statements materially misleading. Defendants had a duty to disclose such information to prevent the statements they actually made from being misleading.

55. Defendants' material misrepresentations and omissions of material facts included: grossly overstating the value of Missfresh; presenting company financials as the basis for that valuation which the company has now publicly stated were false due to overstated revenue; presenting Missfresh as comparable to a successful company, Dingdong; stating that there was strong support for the IPO in the price range that had been represented, even just days prior to the IPO when it must have been clear that was not true; and repeatedly endorsing a business it knew would not perform well upon IPO.

56. Defendants misled Plaintiffs to their prejudice by inducing Plaintiffs to purchase the Securities, providing Defendants financial gain to their advantage.

57. Plaintiffs were reasonably and justifiably misled by relying on Defendants' material misrepresentations and omissions.

58. As a direct and proximate result of the violation of Civil Code Section 1573 and common law, Plaintiffs have been damaged in the sum of at least Fifty-Three Million Seventy-Two Thousand Sixty-Eight Dollars and Fifty-Six Cents

($53,072,068.56 USD).

59. The aforementioned acts of Defendants, and each of them, were oppressive, fraudulent, and malicious within the meaning of California Civil Code Section 3294. Defendants' actions were committed with the intent to annoy, harass, and vex Plaintiffs; and they were committed with a willful, wanton and conscious disregard of the rights of Plaintiffs. Defendants authorized and ratified the JPMS VP's wrongful conduct as alleged herein, and the advance knowledge and conscious disregard, authorization and ratification were on the part of an officer, director or managing agent of Defendants. Plaintiffs are therefore entitled to an award of exemplary damages against all Defendants according to proof.

## FIFTH CAUSE OF ACTION

### (Negligent Misrepresentation)

### Against All Defendants

60. Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 59 above and incorporates them by reference as though fully set forth herein.

61. Defendants made statements to Plaintiffs that were materially false and failed to disclose information that made other statements materially misleading including: grossly overstating the value of Missfresh; presenting Missfresh as comparable to a successful company, Dingdong; and repeatedly endorsing a business it knew would not perform well upon IPO.

62. Given the information revealed by the audit in July 2022, JPMS had no reasonable grounds for believing the representations it made regarding Missfresh's valuation were true when it made them.

63. JPMS intended for the Kairos Fund to rely on its valuations, comparisons, and other representations by providing them to Missfresh to share with potential inventors and by displaying and touting the $12 billion valuation of Missfresh during the Investor Call with limited partners of the Kairos Fund.

64.     The Kairos Fund reasonably relied on the representations by JPMS as a highly-regulated, reputable global financial services firm.

65.     As a direct and proximate result of the negligent misrepresentation, Plaintiffs have been damaged in the sum of at least Fifty-Three Million Seventy-Two Thousand Sixty-Eight Dollars and Fifty-Six Cents ($53,072,068.56 USD).

66.     The Kairos Fund would never have invested in Missfresh but for JP Morgan's valuation.  It relied on JP Morgan's expertise and, more importantly, its knowledge of Missfresh in particular.

## SIXTH CAUSE OF ACTION

### (Violation of the Unfair Competition Law, California Business and Professions Code § 17200 *et seq.*)

### Against All Defendants

67.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 66 above and incorporates them by reference as though fully set forth herein.

68.     Beginning at an exact date unknown to Plaintiffs but at least since May 2021, JPMS has committed acts of unfair competition, as defined by Business and Professions Code section 17200, by engaging in the following practices: grossly overstating the value of Missfresh; presenting company financials as the basis for that valuation which the company has now publicly stated were false due to overstated revenue; presenting Missfresh as comparable to a successful company, Dingdong; stating that there was strong support for the IPO in the price range that had been represented, even just days prior to the IPO when it must have been clear that was not true; and repeatedly endorsing a business it knew would not perform well upon IPO.

69.     These acts and practices, as described in paragraphs 9-23 and 25-40 above, violate Business & Professions Code section 17200 in the following respects: JPMS's above listed practices violate 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5(a) and (c), California Corporations Code Sections 25401 and 25501, and, consequently,

constitute an unlawful business act of practice within the meaning of Business and Professions Code section 17200. Additionally, JPMS's above listed practices are likely to mislead the general public and, consequently, constitutes a fraudulent business act or practice within the meaning of Business and Professions Code section 17200.

70. The unlawful, unfair, and fraudulent business practices and false and misleading advertising of JPMS, as described above, presents a continuing threat to members of the public in that JPMS can use its name and reputation to institute a similar scheme to defraud investors out of millions.

71. As a result of the aforementioned acts, Plaintiffs have lost money or property and suffered injury in fact. JPMS was unjustly enriched when it received, and continues to hold, fees and commissions it obtained from fraudulently inducing investors, like the Kairos Fund, to invest significant sums of money into Missfresh.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1

## **PRAYER FOR RELIEF**

2
    **WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

3
    1.  For general damages, plus interest, according to proof at trial;

4
    2.  For rescission, restitution, and disgorgement of all profits in an amount

5
        sufficient to force Defendants to disgorge all ill-gotten gains;

6
    3.  For punitive damages according to proof at trial;

7
    4.  For reasonable attorneys' fees and costs incurred herein and to the extent

8
        permitted by law;

9
    5.  For prejudgment interest; and

10
    6.  For such other relief as this Court deems just and proper.

11

12
DATED:  June 22, 2023          THEODORA ORINGHER PC

13

14

15
                By: _____

16
                    Todd C. Theodora

Timothy J. Heggem

17
                    Attorneys for Plaintiffs Kairos Investment

18
                    Management Company, LLC and Kairos

Manford Private Equity Fund I LP, a

19
                    British Virgin Islands limited partnership

20

21

22

23

24

25

26

27

28

# **DEMAND FOR JURY TRIAL**

Plaintiffs KAIROS INVESTMENT MANAGEMENT COMPANY, LLC and KAIROS MANFORD PRIVATE EQUITY FUND I LP, a British Virgin Islands Limited Partnership hereby demands a trial by jury on every issue on which it is so entitled.


DATED:  June 22, 2023                    THEODORA ORINGHER PC


                                         By: _____
                                             Todd C. Theodora
                                             Timothy J. Heggem
                                             Attorneys for Plaintiffs Kairos Investment
                                             Management Company, LLC and Kairos
                                             Manford Private Equity Fund I LP, a
                                             British Virgin Islands limited partnership

*COMPLAINT FOR DAMAGES*